## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---------------------------------------------------------

BRIAN PASCUAL, Individually and on Behalf of All Others Similarly Situated,

           Plaintiff,

    v.

BUFFALO WILD WINGS INC., JANICE L. FIELDS, SCOTT O. BERGREN, CYNTHIA L. DAVIS, ANDRE J. FERNANDEZ, HARRY A. LAWTON, RICHARD T. MCGUIRE III, JERRY R. ROSE, SAM B. ROVIT, and HARMIT J. SINGH,

           Defendants.

---------------------------------------------------------

Civil Action No. _____

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMAND**

## CLASS ACTION COMPLAINT

Brian Pascual ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## SUMMARY OF THE ACTION

1. This is a class action brought by Plaintiff on behalf of himself and the other public shareholders of Buffalo Wild Wings Incorporated ("Buffalo Wild Wings" or the "Company"), other than Defendants and their affiliates, against Buffalo Wild Wings and its Board of Directors (the "Board" or the "Individual Defendants," and together with Buffalo Wild Wings, the "Defendants") for their violations of Section 14(a) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and 17 C.F.R. § 229.1015(b)(4), in connection with the proposed merger between Buffalo Wild Wings and Arby's Restaurant Group, Inc. ("Arby's") (the "Proposed Transaction").

2. On November 28, 2017, Buffalo Wild Wings and Arby's issued a joint press release announcing they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Arby's will acquire Buffalo Wild Wings. Under the terms of the Merger Agreement, Buffalo Wild Wings shareholders will have the right to receive $157.00 in cash per share for each share of Company common stock they own (the "Merger Consideration"). The Proposed Transaction is valued at approximately $2.9 billion.

3. On December 28, 2017, Buffalo Wild Wings filed a Definitive Proxy Statement (the "Proxy") on Schedule 14A with the SEC. The Proxy, which recommends that Buffalo Wild Wings shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the financial analyses conducted by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"); and (ii) past dealings or a historical relationship between Goldman Sachs and either Buffalo Wild Wings or Arby's.

4. The special meeting of Buffalo Wild Wings shareholders to vote on the Proposed Transaction is scheduled for February 2, 2018. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's public

common shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Buffalo Wild Wings maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of Buffalo Wild Wings common stock and has held such shares since prior to the wrongs complained of herein.

10.     Defendant Buffalo Wild Wings is a Minnesota corporation with its principal executive offices located at 5500 Wayzata Boulevard, Suite 1600, Minneapolis, Minnesota 55416.   The Company owns, operates, and franchises restaurants.   The Company offers both dining and bar areas for its guests.   Buffalo Wild Wings common stock trades on the NASDAQ under the symbol "BWLD".

11.     Defendant Janice L. Fields ("Fields") is, and has been since August 2017, a director of the Company.

12.     Defendant Scott O. Bergren ("Bergren") is, and has been since June 2017, a director of the Company.

13.     Defendant Cynthia L. Davis ("Davis") is, and has been since 2014, a director of the Company.

14.     Defendant Andre J. Fernandez ("Fernandez") is, and has been since 2016, a director of the Company.

15.     Defendant Harry A. Lawton ("Lawton") is, and has been since 2016, a director of the Company.

16.     Defendant Jerry R. Rose ("Rose") is, and has been since 2010, a director of the Company.

17.     Defendant Sam B. Rovit ("Rovit") is, and has been since March 2017, a director of the Company.

18.     Defendant Harmit J. Singh ("Singh") is, and has been since 2016, a director of the Company.

19.     Defendant Richard Trainor McGuire III ("McGuire") is, and has been since June 2017, a director of the Company.

20.     The defendants in paragraph 11 through 19 are referred to collectively as the "Individual Defendants" together with Buffalo Wild Wings as "Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Buffalo Wild Wings common stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

22.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of December 21, 2017, there were over 15 million outstanding shares of Buffalo Wild Wings common stock.  The holders of these

shares are believed to be geographically dispersed throughout the United States;

(b)   There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

    i.   whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

    ii.   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.   whether Plaintiff and the other members of the Class would suffer irreparable injury if compelled to vote their shares based on the materially incomplete and misleading Proxy.

(c)   Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)   Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)   the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)   Defendants have acted on grounds generally applicable to the Class

with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)   a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Company Background and Proposed Transaction

23.   Buffalo Wild Wings is an established and growing owner, operator, and franchisor of restaurants featuring a variety of boldly-flavored, crave-able menu items. The Company's restaurants include an extensive multi-media system, a full bar and an open layout, which appeals to both sports fans and families. Buffalo Wild Wings offers the option of watching sporting events on approximately sixty televisions, competing in Trivia or playing video games.

24.   The Company operates as a single segment for reporting purposes. As of September 24, 2017, Buffalo Wild Wings owned and operated 638 company-owned restaurants in the United States and Canada. In addition, the Company also franchised an additional 633 restaurants in the United States and around the world. In the fourth quarter of 2017, the Company expected to open five company-owned Buffalo Wild Wings restaurants, as well as open three restaurants by franchisees.

25.     The Company's revenue is generated by: (i) sales at company-owned restaurants; and (ii) royalties and franchise fees received from franchisees.[1]  Sales at company-owned restaurants represented 95% of total revenue in the third quarter of 2017. Food and non-alcoholic beverages accounted for 81% of restaurant sales. Alcoholic beverages accounted for 18% of restaurant sales and other items accounted for the remaining 1% of restaurant sales. The menu items with the highest sales volumes in the third quarter of 2017 are traditional and boneless wings, which accounted for 22% of restaurant sales.

26.     On November 28, 2017, Buffalo Wild Wings and Arby's issued a joint press release announcing the Proposed Transaction, which states in relevant part:

### Arby's Restaurant Group, Inc. and Buffalo Wild Wings, Inc. Announce Definitive Merger Agreement

ATLANTA & MINNEAPOLIS--(BUSINESS WIRE)--Nov. 28, 2017-- Arby's Restaurant Group, Inc. ("ARG") and Buffalo Wild Wings, Inc. (Nasdaq: BWLD) ("BWW") today announced that the companies have entered into a definitive merger agreement under which ARG will acquire BWLD for $157 per share in cash, in a transaction valued at approximately $2.9 billion, including BWW's net debt. The agreement, which has been unanimously approved by both companies' Boards of Directors, represents a premium of approximately 38% to BWW's 30-day volume-weighted average stock price as of November 13, 2017, the latest trading day prior to news reports speculating about a potential transaction.

---

[1]  Form 10-Q for the quarterly period ended September 24, 2017, filed with the SEC at https://www.sec.gov/Archives/edgar/data/1062449/000106244917000137/bwld201792410-q.htm

**Statement by Paul Brown, Chief Executive Officer of Arby's Restaurant Group, Inc.**

"Buffalo Wild Wings is one of the most distinctive and successful entertainment and casual dining restaurant companies in America," said Paul Brown, CEO of Arby's Restaurant Group, Inc. "We are excited to welcome a brand with such a rich heritage, led by an exceptionally talented team. We look forward to leveraging the combined strengths of both organizations into a truly differentiated and transformative multi-brand restaurant company."

**Statement by Sally Smith, Chief Executive Officer of Buffalo Wild Wings, Inc.**

"We are excited about this merger and confident Arby's represents an excellent partner for Buffalo Wild Wings," said Sally Smith, CEO of Buffalo Wild Wings. "This transaction provides compelling value to our shareholders and is a testament to the hard work and efforts of our talented Team Members and franchisees. We are confident that the strength of our two industry-leading brands, under the sponsorship of Roark Capital – an experienced restaurant and food service investor – will enable us to capitalize on significant growth opportunities in the years ahead."

**Transaction Details**

The transaction is not subject to a financing condition and is expected to close during the first quarter of 2018, subject to the approval of BWW shareholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

Following the close of the transaction, BWW will be a privately-held subsidiary of Arby's Restaurant Group, Inc. and will continue to be operated as an independent brand. Paul Brown will serve as Chief Executive Officer of the parent company.

Arby's is majority owned by affiliates of Roark Capital Group (Roark), an Atlanta based private equity firm that focuses on investing in franchised and multi-unit businesses

in the restaurant, retail and other consumer sectors. Affiliates of Roark are committing all of the equity that, together with the proceeds of debt financing, will be necessary to complete the transaction.

Certain funds advised by Marcato Capital Management, LP, which own approximately 6.4% of the outstanding shares of BWW, have entered into an agreement to vote in favor of the transaction.[2]

27.     The Merger Consideration offered to Buffalo Wild Wings' public shareholders in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the Merger Consideration being offered for those securities in the Proposed Transaction given the Company's prospects for future growth and earnings.   The Proposed Transaction will deny Class members their right to fully share equitably in the true value of the Company.

28.     For example, the Company's third quarter 2017 results, released on October 25, 2017, were very positive. The Company's President and Chief Executive Officer, Sally Smith, commented on these results:

Our teams are executing on the cost initiatives of our fiscal fitness program and we exceeded our goal in the third quarter. These savings helped deliver adjusted income from operations above our expectations. The recent Tuesday promotion shift from traditional to boneless wings at company-owned restaurants will continue to improve cost of sales while traditional wing prices remain elevated. Combined with our cost savings initiatives and service

---

[2] http://ir.buffalowildwings.com/node/15761/pdf

excellence focus, we are optimistic these actions will deliver an improving bottom line.[3]

29.     Likewise, the $157.00 Merger Consideration represents a **10.3% discount** from the Company's 52-week high of $175.19 per share of Buffalo Wild Wings common stock.

30.     Furthermore, even the financial analyses conducted by Goldman Sachs valued the Company at a significantly higher price than the Merger Consideration.

31.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the analysis demonstrated an implied per share price up to $176, which illustrates that each share of Buffalo Wild Wings stock has an inherent premium of **approximately 112%** over the Merger Consideration.

32.     Likewise, with respect to Goldman Sachs' *Transaction Premia Analysis*, the analysis demonstrated an implied per share price up to $170, which illustrates that each share of Buffalo Wild Wings stock has an inherent premium of **approximately 109%** over the Merger Consideration.

33.     In sum, it appears that Buffalo Wild Wings is well-positioned for financial growth and that the Merger Consideration fails to adequately compensate the Company's shareholders.  It is therefore imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's

---

[3] *Buffalo Wild Wings, Inc. Announces Third Quarter Earnings per Share of $1.17 and Adjusted Earnings per Share of $1.36*, Seeking Alpha (Oct. 26, 2017), *available at* https://seekingalpha.com/pr/16980067-buffalo-wild-wings-inc-announces-third-quarter-earnings-per-share-1_17-adjusted-earnings-per.

shareholders can properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

## II.    The Materially Incomplete and Misleading Proxy

34.    On December 28, 2017, Defendants filed the Proxy with the SEC.   The information contained in the Proxy has thus been disseminated to Buffalo Wild Wings shareholders to solicit their vote in favor of the Proposed Transaction.   The Proxy omits certain material information concerning the fairness of the Proposed Transaction and Merger Consideration.   Without such information, Buffalo Wild Wings shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Material Omissions Concerning Goldman Sachs' Financial Analyses*

35.    First, with respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the Company's illustrative terminal values; (ii) the Company's cost of long-term debt; (iii) the Company's beta, in addition to the inputs and assumptions underlying the calculation of the Company's beta; and (iv) the Company's net debt and noncontrolling interests as of September 24, 2017.  *See* Proxy 43.   The omission of this material financial information renders the summary of the Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* analyses and the derived values set forth therein incomplete and misleading.

36.    Indeed, as a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a

banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id.* at 1577-78.

37.     With respect to Goldman Sachs' *Selected Companies Analysis*, the Proxy fails to disclose the individual multiples for each of the companies reviewed in the analyses. A fair summary of analyses requires the disclosure of the individual multiples for each company. Merely providing the mean and median values to render the Enterprise Value/EBITDA and P/E multiples is insufficient, as shareholders are unable to assess whether the banker utilized the appropriate companies, or instead, applied companies that would drive down the Company's Enterprise Value/EBITDA and P/E multiples. Accordingly, the omission of the individual multiples renders the summary of

these analyses set forth on pages 42 through 43 of the Proxy materially incomplete and misleading.

38.     With respect to Goldman Sachs' *Transaction Premia Analysis*, the Proxy fails to disclose any information concerning the transactions Goldman Sachs reviewed besides the time frame from which the transactions were selected.  A fair summary of this analysis requires disclosure of the number of transactions that were viewed and what industries and/or market segments the respective companies operated in (*i.e.,* franchise restaurants).   In the absence of such information, Buffalo Wild Wings common shareholders are unable to assess whether Goldman Sachs utilized appropriate transactions or instead, referenced certain transactions in order to artificially reduce the illustrative implied price per share of Buffalo Wild Wings common stock and, as a result, make the Merger Consideration appear more favorable.  The omission of the number, relevant parties, and industries and/or market segments renders the summary of the analysis materially incomplete and misleading.

39.     Lastly, the Proxy fails to disclose the previous work Goldman Sachs has done for both Buffalo Wild Wings and Arby's.  In particular, the Proxy fails to disclose: (i) a description of the services Goldman Sachs has provided to Buffalo Wild Wings in the past two years and the amount of fees it has received for such services; and (ii) a description of the services Goldman Sachs has provided to Arby's in the past two years and the amount of fees it has received for such services.   Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17

C.F.R. § 229.1015(b)(4).   Such information is also material to Buffalo Wild Wings shareholders.   Indeed, it is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts.   A financial advisor's own financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis.   A reasonable shareholder would want to know about any economic motivations the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have.   Especially when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to him than approving a deal at a truly fair price to shareholders.   The complete omission of any of Goldman Sachs' previous dealings or historical relationships renders the Proxy incomplete and misleading.

40.   In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

41.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42.     Defendants have filed the proxy with the SEC with the intention of soliciting Buffalo Wild Wings shareholders support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

43.     In doing so, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Buffalo Wild Wings, where aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

44.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

45.     Defendants issued the Proxy with the intention of soliciting Buffalo Wild Wings public common shareholders support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide material information regarding, amongst other things: (i) the financial analyses conducted by the Company's financial advisor, Goldman Sachs; and (ii) past dealings or a historical relationship between Goldman Sachs and either Buffalo Wild Wings or Arby's.

46.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's common shareholders although they could have done so without extraordinary effort.

47.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy Statement states that Goldman Sachs reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman

Sachs, as well as, its fairness opinion and the assumptions made and matters considered in connection therewith.   Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.   The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.   Indeed, the Individual Defendants were required to, separately, review Goldman Sachs' analyses in connection with their receipt of the fairness opinions, question Goldman Sachs as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

48.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.   Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

49.     Buffalo Wild Wings is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

50.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of Buffalo Wild Wings within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Buffalo Wild Wings and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.   They were, thus, directly involved in the making of the Proxy.

55.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions

as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

58.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 5, 2018          **HELLMUTH & JOHNSON, PLLC**


By  *s/Russell M. Spence, Jr.*
Russell M. Spence, Jr. #241052
8050 West 78th Street
Edina, MN 55439
Tel:  952.941.4005
Fax:  952-941-2337
Email:  mspence@hjlawfirm.com


**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel:  212-971-1341
Fax:  212-202-7880
Email: jmonteverde@monteverdelaw.com


*Attorney for Plaintiff*